George W. Marthen, J.
On Sunday, July 28, 1973 as residents and vacationers were leaving their places of worship and preparing for another day of relaxation in the beautiful Adirondack Mountains, the peace and tranquility for which Hamilton County has long been famous was shattered by the *253 announcement that a man armed with a rifle had four young campers tied to trees in a secluded area of the county. There evolved from the occurrences and circumstances which were to be disclosed in the days that lay ahead a tale so bizarre as to create widespread national and even international interest. The defendant, having taken to the woods to avoid capture, eluded his pursuers for a period of 12 days in the face of what was possibly the largest manhunt ever conducted in the State of New York, if not the Nation.
Following his wounding and apprehension the Grand Jury of the County of Hamilton returned seven indictments against the defendant accusing him of various crimes ranging from unauthorized use of a vehicle to murder. The defendant was arraigned in this court on September 19, 1973 upon all of the indictments returned against him and, following that arraignment, the District Attorney of Hamilton County advised the court that he would proceed first upon the murder indictment. This court thereupon fixed the date upon which the court would hear motions by the defendant.
The court was also advised that the defendant was apparently unable to afford counsel and that the defendant requested that Frank H. Armani, Esq., of Syracuse, New York, who had represented him previously, be assigned to defend him together with Francis R. Beige, Esq., also of Syracuse. Since Mr. Armani and Mr. Beige had involved themselves in the case prior to the arraignment, they were given the opportunity to make formal application to the court and, following a determination that the defendant was unable to afford counsel and that his family, in fact, were the recipients of public assistance from the County of Onondaga, this court by order dated November 21, 1973 did appoint such attorneys to represent the defendant.
On the 23d day of October, 1973 the defendant moved this court for an examination pursuant to CPL article 730 to determine his fitness to proceed. Thereafter, and upon such application, this court ordered the Director of Marcy Hospital to cause an appropriate examination to be made of the defendant and such examination resulted in the report of the two examining physicians that the defendant was able to understand the nature of the charges against him and to participate in his own defense. The defendant then moved for a hearing upon that issue and was granted such hearing. Following the hearing, at which the examining physicians testified, the court *254 found that the defendant was fit to proceed and directed the attorneys for the defendant to move forward with their other motions.
Prior to trial there were motions for a bill of particulars and discovery, for a Wade hearing on the issue of identification, to suppress evidence, and to inspect the Grand Jury minutes and dismiss the indictment as not being supported by sufficient, competent, relevant and material evidence. Individual hearings on suppression of identification and tangible evidence were afforded the defendant. The court also heard argument and considered evidence as to the defendant’s physical condition and his ability to proceed as affected thereby.
After all pretrial proceedings, had been concluded the court fixed May 8, 1974 as the date for commencement of trial.
Following a conference on the record at which the court outlined for counsel the procedures which would be followed and the conduct expected by the court from counsel and at which various applications were made to and ruled upon by the court, the court examined prospective jurors, who had been summoned, as to their qualifications and exemptions and heard requests to be excused, all in the presence of the defendant, his counsel and counsel for the People. Before sufficient prospective jurors were impaneled to reasonably assure the selection of a jury after voir dire examination some 11 days were consumed screening approximately 200 persons per day and attempting to serve jury summonses upon 240 persons per day selected on a representative basis from the list of registered voters from each town in the county. Although at some stage of this process the defendant made application orally to be relieved of participation, the court, by reason of the defendant’s position that he could not obtain a fair trial in Hamilton County, which position had been advanced as the basis for a previous application to the Appellate Division for a change of venue, directed that the defendant and counsel remain present until an appropriate panel could be obtained.
The actual voir dire examination consumed 10 days having commenced on Wednesday, May 29, 1974 and terminated on Saturday, June 8, 1974 with only Sunday, June 2, not having been utilized by the court as a working day.
On Monday, June 10, 1974 the trial got underway with the court’s opening charge to the jury followed by opening statements by the District Attorney and defense counsel. On Fri *255 day, June 14 the prosecution rested its case after having presented 32 witnesses. On Monday, June 17, 1974, the trial continued with the District Attorney first being permitted to reopen his case for the purpose of presenting one additional piece of evidence and, thereafter, the defendant moved forward with his defense, the court having previously and at the close of the People’s case denied defendant’s motion for a trial order of dismissal pursuant to CPL 290.10. The defendant, taking the stand in his own behalf and as his first witness, testified in general as to his childhood and previous criminal conduct and reconstructed for the jury not only circumstances surrounding the killing of Philip Domblewski, the young man for whose murder he was being tried, but also related in detail the circumstances surrounding the deaths of Daniel Porter, Susan Petz and Alicia Hauck. The defendant rested his case on June 22, 1974, the only day not being utilized for trial being Sunday, June 23, 1974. On June 24, 1974 the prosecution moved forward with its rebuttal testimony on the issue of insanity and finally rested on June 25. On June 26, 1974 it appeared that the jury, although having been sequestered from the time each was seated and sworn, might have been tainted by publicity which inadvertently, and in spite of stringent controls instituted by the court and Hamilton County Sheriff, had come to their attention. After individual interrogation of the jurors it was determined that no taint had resulted and the defendant’s objections were withdrawn. The afternoon of June 26, 1974 saw the defense producing one witness in surrebuttal following which the defense rested. Thereafter the defendant’s motion for directed verdict of acquittal was denied by the court. The trial itself had, by then, consumed 14 days.
On the afternoon of the 26th and morning of the 27th of June the court heard requests to charge and exceptions to charge out of the presence of the jury and ruled upon each. Thereafter the defense presented its summation, followed by closing argument by the People and on the afternoon of the 27th of June the court presented its charge to the jury and retired the jury for deliberation. In the early evening of that date the jury returned its verdict of guilty as charged. The court then set July 1, 1974 as the date upon which it would hear posttrial motions and on that date denied the defendant’s motion to set aside the verdict and upon the defendant’s waiver of any delay in sentencing and upon his stated request *256 to start his appeal at the earliest date possible and the court having been furnished with a full and complete probation presentence investigation which was current to a time just prior to his embarkation upon the course of conduct which led to his apprehension, the court imposed sentence of 25 years to life.
The court is not hesitant to point out that counsel for the defendant devoted extraordinary energy and talent to the defense in this case. The disclosure upon trial that the defendant admitted to his counsel, at an early stage of their representation, that he had committed three other murders and could direct them to the locations of the bodies of two of his victims, whose deaths had not theretofore been confirmed, rocked not only the news media but the foundation of our system of criminal justice. Who can imagine the anguish of these attorneys, fathers themselves, at having to carry inviolate this confidence knowing full well the agonies endured by the parents of the missing girls? Who can appreciate the torment, after the disclosure was made public, suffered by them as a result of the poisoned pens and poisoned tongues of the self-righteous? Who, indeed, in the legal profession can truly and objectively look back from the comfortable chair of the Monday morning quarterback and say, "I would have done thus and so in spite of the ethic of confidentiality which I am sworn to uphold”? Indeed, who can understand the anguish of having to defend oneself months later against charge of criminal wrongdoing where one has acted in the highest tradition of the legal profession? Who, indeed, but the one involved.
As Mr. Armani has pointed out in his affidavit upon this application, the occurrences disclosed and the subsequent charges and investigation by the Onondaga County Grand Jury (and which resulted in his being cleared) were disastrous to his law practice and although no similar allegations have been made by Mr. Beige, the court can only conclude that some similar experience would be his.
The court has reviewed various opinions upon the issue of what constitutes such "extraordinary circumstances” as would justify compensation in excess of the limits fixed by section 722-b of the County Law. (Matter of Crimi, 60 Misc 2d 144; People v Perry, 27 AD2d 154; People v Wheat, 80 Misc 2d 844.) In People v Perry (supra, p 163) the Presiding Judges of the Appellate Division First and Second Departments jointly analyzed the provisions for payment of assigned counsel, vis á *257 vis extraordinary circumstances, as to legislative history, Federal criteria and criteria in their own departments. Their summary is worthy of inclusion here.

Summary

"The Presiding Justice is vested with complete discretion to approve, disapprove or modify any allowances in excess of the statutory limits because of 'extraordinary circumstances’. The legislative history of section 722-b of the County Law, considered in conjunction with the history of, and the Federal decisions interpreting the cognate Federal Criminal Justice Act of 1964, seems to require the same interpretation for 'extraordinary circumstance’ as involving inordinate time necessarily and reasonably spent on a case. Since, therefore, the time reasonably spent should be the preponderating consideration in reviewing an allowance because of 'extraordinary circumstances’, the Presiding Justice should not be called upon to approve any such allowance solely upon the basis of forms which show hours spent only. Whenever an assigned attorney seeks compensation in excess of the statutory limits because of 'extraordinary circumstances’, a detailed affidavit should be submitted which shows not only the time spent in hours but also the nature of the crime charged, the disposition of the case, the manner in which the time was spent, the necessity therefor and any other facts which tend to demonstrate 'extraordinary circumstances.’ Only then can the Presiding Justice properly perform the duty imposed upon him under the statute to review such allowances.”
Although it is clear that any application approved by the trial court must thereafter be forwarded to the Presiding Judges of the appropriate Appellate Department for "approval, disapproval or modification”, it seems equally clear that the Trial Judge who had first-hand, firing line knowledge of the representation involved would be most remiss were he to ignore such knowledge and summarily deny the application for increased compensation. The Presiding Judges of the First and Second Department, in the cases decided by them, pointed out the paucity of factual information before them upon which to conduct their review of the Trial Judge’s determination. The attorneys making the instant application have submitted detailed affidavits which this court deems sufficient to overcome that objection.
The Supreme Court of the State of Illinois, in 1966, in *258 People ex rel. Conn v Randolph (35 Ill 2d 24, 27), in ruling upon a request for additional compensation of five attorneys, where nine weeks were needed to select the jury; 1150 veniremen were questioned; where four weeks of trial ensued and where the attorneys were required to live away from home and to suspend their practices until the trial was concluded, commented as follows:
"Never before in the history of the State of Illinois has Court appointed counsel been asked to devote so much time, energy, incur so many expenses, and to expend so much of their own personal funds for the defense of any indigent persons in a trial of such lengthy duration and complexities”. The court then commented on the attorneys being required to live away from home, having families to support, their inability to earn other income while so engaged and concluded that they had "suffered and will suffer the loss of legal business that will affect their income, both presently and in the . future”. The five attorneys in that case sought total compensation of $31,000 while the statute under which they were appointed, as is the case in New York, limited compensation to $500. The court then held that while a statute limiting compensation to $500 is not unconstitutional on its face, the application of such limitation to the facts presented where the attorneys were suffering extreme, if not ruinous, loss of practice and income and expenditures of large out-of-pocket sums would be unconstitutional.
This court has been unable to find any New York case approaching the circumstances of the instant application let alone being so nearly on all fours as the Illinois case cited above and cites same with its wholehearted approval.
This court is not unmindful of the longstanding practice of assigned counsel to represent indigent persons with no fee payable for such services and the principle that a license to practice law carries with it the noble burden of defending the poor. (Matter of Sullivan [Alesi], 297 NY 190.) With the advent, however, of article 18-B of the County Law of the State of New York came recognition of the duty of the public to at least in part, share this burden. No court has recognized an absolute right, or for that matter even a qualified right, to compensation equalling that which the attorney would receive were he to be retained privately. This court feels that it can take judicial notice of the fact that compensation which would be paid for the services here performed if rendered pursuant *259 to private retainer would far exceed any allowance which might be appropriate within the framework of existing provisions of law. Section 722-b of the County Law provides for a noncapital felony a fee of $10 per hour for time reasonably expended out of court and $15 per hour for time expended in court provided the total of such compensation does not exceed $500. It is the opinion of this court that such limitation as applied to the circumstances here and as outlined above would be so grossly unjust as to be unthinkable. For such reason this court recommends disposition of these claims subject to the review of the Presiding Justice of the Appellate Division, Third Department as follows:
CLAIM OF FRANK H. ARMANI, ESQ.
Hours
Total out of court time claimed Less travel time claimed[1]
632.0
112.1 _
Adjusted out of court time Less time spent before arraignment[2]
519.9
33.5 _
Net out of court time Total in court time
486.4 @ $10 per hr. $4864.00
206 @ $15 per hr. 3090.00
Total
$7954.00
Upon verifying the addition it was determined that the totals as set forth in Mr. Armani’s petition were incorrect and were corrected as follows:
In court total time changed from 205.5 hours to 206 hours.
Out of court total time changed from 618.7 hours to 632.0 hours.
*260 CLAIM OF FRANCIS R. BELGE, ESQ.
Hours
Total out of court time claimed Less travel time claimed1
379.00
86.00
Adjusted out of court time Less time spent before arraignment2
293.00
99.75
Net out of court time Total in court time
193.25 @ $10 per hr. $1932.50
192.50 @ $15 per hr. 2887.50
Total
$4820.00
This decision together with the petitions upon which it is based will be forwarded to Hon. J. Clarence Herlihy, Presiding Justice of the Appellate Division, Third Department, for his action as required by law.

. It is this court’s feeling that the travel time expended by the petitioners, although the distances from home involved were great, were not untoward in the representation of the defendant and that no allowance should properly be made therefor; and in some instances where this court did not make a pencilled notation in the left margin of the petitions herein as to travel time disallowed where some travel was included in investigatory trips, the court felt that such travel would be reimburseable as time expended.

. This court disallowed any payment for services rendered prior to the arraignment of the defendant in Hamilton County solely for the reason that the court believes itself to be powerless to approve payment for services rendered prior to the defendant’s appearance before it.