The STATE of Oklahoma, Appellant,

v.

Delbert LYNCH, Appellee.

Nos. 74319, 74259.

Supreme Court of Oklahoma.

July 24, 1990.

Robert H. Henry, Atty. Gen. and Carol Price Dillingham, Asst. Atty. Gen., Oklahoma City, for appellant, the State, No. 74,319 and for respondents, Honorable Gordon, No. 74,259 and Melson, et al.

Jack Mattingly, Mattingly & Snow and Rob Pyron, Seminole, for appellee, Delbert Lynch, No. 74,319.

George W. Braly, Braly & Braly, Ada, for petitioners, Pontotoc County, No. 74,-259 and Bar Ass'n, et al.

KAUGER, Justice.

In these cases of first impression,[1] we are asked to decide whether the trial court

---

1. These cases are deemed consolidated: 74,319, *State v. Lynch* and 74,259, *Pontotoc County Bar*

erred in declaring 21 O.S.Supp.1985 § 701.14 unconstitutional because court appointed counsel were forced to represent indigent defendants without the assurance of receiving adequate, speedy, and certain compensation for such representation.[2] We find that: 1) Although the statute is not facially unconstitutional, under the facts presented in Cause no. 74,319, it is unconstitutional in application; 2) The present system presses lawyers into service without affording a post-appointment opportunity to show cause why they should not be forced to accept the appointment; and 3) The statute provides an arbitrary and unreasonable rate of compensation for lawyers which may result in an unconstitutional taking of private property depending on the facts of each case.

While we recognize the responsibility of members of the Oklahoma bar to assist in the provision of legal representation to indigent defendants, we find that in some instances the arbitrary and unreasonable statutory scheme contravenes the due process clause of the Okla. Const. art. 2, § 7 as well as the immunities clause of the Okla. Const. art. 5, § 51. In reaching this conclusion, we do not rely on federal authorities, and any reference thereto is solely for illustrative purposes.[3] The Okla-homa Constitution provides bona fide, separate, adequate and independent grounds upon which we rest our finding.

## FACTS

Two Seminole County lawyers, Jack Mattingly and Rob L. Pyron, were appointed by the district court to represent Delbert Lynch, an indigent who had been charged with first degree murder. Although the State had sought the death penalty, after a complicated trial, which began on August 21, 1989, and ended on August 31, 1989, the jury rendered a guilty verdict and gave Lynch a life sentence. Following Lynch's sentencing on September 6, 1989, the lawyers petitioned the court for fees and expenses.

At the hearing on counsel fees, Mattingly testified that he had spent 169 hours on the case, and incurred $173.03 in out of pocket expenses, requesting a $17,073.03 fee. Pyron's testimony was that he had expended 109.55 hours on Lynch's behalf, and he sought a $10,995.00 fee. Mattingly submitted a statement documenting his hourly overhead rate for 1986, 1987, 1988 which ranged from $45.80 to $53.53—averaging $50.88. Pyron submitted his overhead figures for 1988, reflecting an average hourly rate of $48.00.[4] Had the two

Ass'n v. Melson. Although standing is not an issue in *Lynch*, it is an issue in *Pontotoc County Bar Assoc.* We find that the issue is without merit because this Court found in *Missouri–Kansas–Texas R.R. v. State*, 712 P.2d 40, 42 (Okla.1985), that an unincorporated association can have standing through its members.

2. The Court fund is not subject to suit in the district court. However, the instant cause is treated as a common law writ which is reviewable by writ but is not appealable. See, *Court Fund v. Cook*, 557 P.2d 875, 878 (Okla.1976).

3. *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).

4.

MATTINGLY & SNOW
SEMINOLE, OKLAHOMA

INDIRECT/OVERHEAD COSTS

| | 1986 | 1987 | 1988 |
|---|---|---|---|
| Salaries | $38,929 | $ 47,965 | $ 41,776 |
| Taxes | 3,469 | 4,513 | 4,723 |
| Repairs | 4,851 | 3,029 | 2,670 |
| Depreciation | 13,288 | 14,769 | 11,348 |
| Advertising | 453 | 113 | 68 |
| Bank Charges | 76 | 18 | 133 |
| Dues and Subscriptions | 1,401 | 1,042 | 943 |
| Equipment Rental | 419 | 436 | 833 |
| Insurance | 8,159 | 12,481 | 17,354 |

lawyers split the maximum statutory fee of $3,200.00, Mattingly would have received $9.47 per hour, with Pyron receiving $14.61 per hour. Based on these computations, Mattingly would lose $41.41 and Pyron would lose $33.39 in overhead expenses for every hour that they worked on the defense. These figures do not reflect any compensation for the attorneys' services.[5] The trial court approved the requested fees, finding that the $3,200.00 restriction on attorney fees was unconstitutional. The

| | 1986 | 1987 | 1988 |
|---|---|---|---|
| Janitorial Service | 370 | 535 | –0– |
| Long Distance Service | 461 | 52 | 239 |
| Promotion | 110 | 40 | –0– |
| Office Expense | 5,895 | 5,905 | 5,161 |
| Postage | 2,158 | 2,487 | 2,305 |
| Post Office Box Rent | 53 | 53 | –0– |
| Telephone | 4,658 | 6,136 | 5,174 |
| Utilities | 3,195 | 3,407 | 2,415 |
| Bank Box Rent | –0– | 25 | –0– |
| Contract Labor | 564 | 579 | 1,285 |
| Legal & Accounting | 2,352 | 2,733 | 8,003 |
| Professional Seminars | 600 | 545 | 337 |
| Professional Travel | 203 | 21 | 1,211 |
| Library Backup | 3,610 | 4,005 | 5,355 |
| Total | $95,274 | $110,889 | $111,333 |
| Hourly Overhead Rate (based on 2,080 hours per year) | $ 45.80 | $ 53.31 | $ 53.53 |
| Total Overhead Costs for the above 3 years | | | $105,832 |
| Average Hourly Overhead Rate (based on 2,080 hours per year) | | | $ 50.88 |

ROB PYRON
INDIRECT/OVERHEAD COSTS

| | |
|---|---|
| Dues and Subscriptions | $ 2,497.00 |
| Contributions | 990.00 |
| Material & Supplies | 7,318.00 |
| Accounting | 2,293.00 |
| Salaries | 41,925.00 |
| Insurance | 4,349.00 |
| Advertising | 198.00 |
| Rent | 7,255.00 |
| Auto Expense | 2,322.00 |
| Postage, Bank Charge, etc. | 2,274.00 |
| Maintenance | 2,924.00 |
| Utilities & Telephone | 3,881.00 |
| Taxes | 4,508.00 |
| Entertainment | 456.00 |
| Library | 2,874.00 |
| Travel | 13,276.00 |
| Continuing Education | 284.00 |
| Total | $99,624.00 |
| Average Hourly Overhead Rate (based on 2080 hours per year) | $ 48.00 |

5. Had the attorneys received the same hourly pay as district attorneys i.e., $29.26 an hour, Mattingly would contribute $70.67 per hour with Pyron contributing a total of $62.65 per hour to the indigent's defense. These figures include both the overhead and an hourly rate of compensation. A construction of the statute under which each of the appointed lawyers would be paid statutory maximum fee would result in Mattingly receiving $18.93 per hour, and Pyron $29.21—with the accompanying net losses of $61.21 and $48.05 per hour. See discussion infra.

State of Oklahoma appealed and the cause became at issue for our consideration on March 21, 1990.

## I.

## THE STATUTORY COMPENSATION ALLOWED FOR THE REPRESENTATION OF LYNCH IN CAUSE NO. 74,319 VIOLATED ART. 2, § 7, THE DUE PROCESS CLAUSE OF THE OKLAHOMA CONSTITUTION.

The parties do not dispute that Oklahoma is required to provide attorneys for indigent defendants who are charged in Oklahoma courts with felonies, certain misdemeanors, competency to stand trial,[6] contempt proceedings,[7] and guardianship matters,[8] or that the State of Oklahoma has attempted to provide such representation.[9] The basic concern is not with the constitutional requirements of the Okla. Const. art. 2, § 20, or the public policy which requires representation of indigent defendants; but, rather, with the practical application of the public policy and its impairment of constitutionally guaranteed private property rights. The State asserts that compensation should only exceed the statutory limit when extraordinary circumstances are shown as established in *Bias v. State*, 568 P.2d 1269 (Okla.1977), and that an unconstitutional taking does not occur when a court-appointed attorney is required to represent indigent defendants.

The Okla. Const. art. 2, § 7 provides that "No person shall be deprived of life, liberty, or property without due process of law." The lawyers contend that under this constitutional provision mandatory representation without just compensation is unconstitutional. The Okla. Const. art. 2, § 20 also requires that competent counsel be provided for indigent defendants.[10] Under art. 2, § 20, a criminal defendant has a fundamental right to the reasonably effective assistance of counsel, regardless of whether counsel is appointed or retained.[11] This means a lawyer must render the same obligations of loyalty, confidentiality, and competence to a court-appointed client as a retained client would receive. Oklahoma has fulfilled the constitutional requirement of competent counsel by utilizing public defenders' offices, voluntary pools, and court-appointments. In order for the system to work, a balance must be maintained

---

6. Title 22 O.S.Supp.1983 § 1175.2(B)(4) provides:

"4. That if the person whose competency is in question does not have an attorney, the court will appoint an attorney for the person who shall represent him until final disposition of the case;".

7. *Brown v. State*, 677 P.2d 1089, 1091 (Okla. Crim.App.1984); *Johnson v. State*, 599 P.2d 416, 418 (Okla.Crim.App.1979).

8. Title 30 O.S.Supp.1988 § 3–107 provides in pertinent part:

"A. If at or prior to a hearing on a petition alleging a person to be an incapacitated or partially incapacitated person, or if at any point in the course of a proceeding pursuant to said petition, the subject of the proceeding is not represented by counsel, the court may appoint an attorney as provided in this section, ..."

9. The United States Supreme Court in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733·(1963), *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) requires counsel to be appointed for: 1) indigents charged with a felony; 2) in juvenile proceedings which may

result in commitment to an institution; and 3) misdemeanors when imprisonment is a real possibility. These cases imposed a duty upon the states to meet the constitutional guarantee of counsel.

Further 22 O.S.Supp.1985 § 464 provides in pertinent part:

"A. If the defendant appear for arraignment, without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desires the aid of counsel. If he desires and is financially unable to employ counsel, the court must assign counsel to defend him...."

10. Okla. Const. art. 2, § 20, provides in pertinent part:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed ... He shall have the right to be heard by himself and counsel; ..."

11. *Fisher v. State*, 736 P.2d 1003, 1011 (Okla. Crim.App.1987), *aff'd*, 739 P.2d 523 (1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988), *reh'g denied* 487 U.S. 1246, 109 S.Ct. 3, 101 L.Ed.2d 955 (1988).

between the lawyer's oath of office,[12] an indigent's fundamental right to counsel, and the avoidance of state action tantamount to confiscation of a lawyer's practice.

 To achieve an appropriate balance of constitutional interests the rights of both the indigent defendant and the lawyer must be protected. Here, the constitutional right of the indigent to counsel is not at issue—the due process rights of appointed counsel for indigent defendants are. Although it is obvious that while Oklahoma's statutorily mandated cap may not be facially defective, and that in some instances payment of the statutory fee might even be an excessive rate of compensation, there is a substantial probability that it will be defective in application. Here, it is apparent that the maximum statutory fee is inadequate to compensate the lawyers who represented Lynch.[13]

In *Bias v. State*, 568 P.2d 1269, 1272–73 (Okla.1977), a lawyer had been compelled both to subsidize indigent representation and to forsake his regular law practice during the representation of the indigent defendant. The *Bias* Court recognized that such circumstances may constitute a taking of private property without compensation. In order to harmonize conflicting interests, the Court authorized payment in excess of the statutorily prescribed norms for extraordinary expenditures of time and expense. Since *Bias*, we held in *Ford v. Ford*, 766 P.2d 950, 952 (Okla.1988), that a law practice can be considered jointly acquired property subject to division as a part of the marital estate. Under the Court's analysis in *Ford*, an attorney's practice is property under Oklahoma's due process clause—those property rights may not be impaired without adequate recompense.

Clearly, there is a substantial risk of the erroneous deprivation of property rights under the current appointment system. A lawyer's skills and services are his/her

12. Title 5 O.S.1981 § 2 provides:

"Upon being permitted to practice as attorneys and counselors at law, they shall, in open court, take the following oath: You do solemnly swear that you will support, protect and defend the Constitution of the United States, and the Constitution of the State of Oklahoma; that you will do no falsehood or consent that any be done in court, and if you know of any you will give knowledge thereof to the judges of the court, or some one of them, that it may be reformed; you will not wittingly, willingly or knowingly promote, sue, or procure to be sued, any false or unlawful suit, or give aid or consent to the same; you will delay no man for lucre or malice, but will act in the office of attorney in this court according to your best learning and discretion, with all good fidelity as well to the court as to your client, so help you God."

13. The maximum statutory fee set by the legislature is: 1) in capital cases, $200.00 for services rendered before the preliminary hearing, $500.00 for services rendered during the preliminary hearing, $2,500.00 for services rendered from the time the defendant is bound over until final disposition in the trial court; .2) in other criminal cases, the fee is not to exceed $500.00; 3) in juvenile and guardianship cases, the fee is not to exceed $100.00 in a preliminary hearing, $500.00 if the cause goes to trial and $100.00 for post-disposition hearings.

Title 21 O.S.Supp.1985 § 701.14 provides in pertinent part:

"... such attorney shall not be paid a sum to exceed the following amounts:
For services rendered prior to and in preparation for preliminary hearing ............. $200.00
For services rendered at preliminary hearing .. $500.00
For services rendered from the time the defendant is bound over on the charge of murder in the first degree through final disposition in the trial court. $2,500.00 ..."

Title 22 O.S.1981 § 1271 provides in pertinent part:

"... The attorney shall not be paid a sum to exceed Five Hundred Dollars ($500.00) in any one case, ..."

Title 20 O.S.Supp.1989 § 1304(b)(9) provides in pertinent part:

"(9) ... Compensation from the court fund for attorneys appointed pursuant to the Oklahoma Guardianship Act, ... shall be substantially the same as for attorneys appointed in juvenile proceedings pursuant to Title 10 of the Oklahoma Statutes."

Title 10 O.S.Supp.1989 § 24(B) provides in pertinent part:

"B. ... Provided, that such attorney shall not be paid a sum to exceed One Hundred Dollars ($100.00) for services rendered in preliminary proceedings, and such compensation shall not exceed Five Hundred Dollars ($500.00) for services rendered during trial and not to exceed One Hundred Dollars ($100.00) for services rendered at each subsequent post-disposition hearing."

only means of livelihood. The taking thereof, without adequate compensation, is analagous to taking the goods of merchants or requiring free services of architects, engineers, accountants, physicians, nurses or of one of the thirty-four other occupations or professions in this state which require a person to be licensed before practicing the occupation or profession. None of the licensing statutes require that the members of those professions donate their skills and services to the public.[14] We know that many of these professionals do so. We also know that it would be unusual for the various licensing boards to force their licensees to proffer their services to indigents or to offer cut-rate prices on haircuts, perms, embalming, dentures, or surgeries.

We acknowledge that the present system may deprive lawyers of interests in their law practices. Nevertheless, we also recognize that a lawyer's calling is different from that of other licensed professions. We are a government of laws and not of men and women.[15] At the foundation of

this republic is the respect for enforcement of the law in a neutral way. The services of competent counsel are necessary to insure that our system of justice functions smoothly, that justice is dispensed even handedly, and that the rights and interests of indigent defendants are safeguarded in a truly adversarial forum.[16] A lawyer is weighted with responsibility which is uncommon to the ordinary professional,[17] and as a member of the integrated bar, an Oklahoma lawyer has a duty to the oath of office, to the Courts, to his/her clients, and to the public at large to be more than a tradesperson.

Procedural due process of law requires adequate notice, a realistic opportunity to appear at a hearing, and the right to participate in a meaningful manner before one's rights are irretrievably altered.[18] We find that in order to provide safeguards which will bring the system into compliance with due process, trial courts must proffer a post-appointment opportunity for the law-

**14.** The other licensed occupations or professions are:

Certified Public Accountants, 59 O.S.Supp. 1982 § 15.18; Insurance Adjusters, 36 O.S. Supp.1983 § 6206; Architects, 59 O.S.Supp. 1986 § 46.24; Athletic Trainers, 59 O.S.1981 § 530; Bail Bondsmen, 59 O.S.Supp.1987 § 1303; Chiropractors, 59 O.S.Supp.1989 § 164; Court Reporters, 20 O.S.1981 § 1503; Dentists and Dental Hygenist, 59 O.S.1981 § 328.21; Dietitian, 59 O.S.Supp.1984 § 1730, Druggists, 59 O.S.Supp.1988 § 353.9; Electrologist, 59 O.S.Supp.1987 § 536.7; Funeral Directors and Embalmers, 59 O.S.Supp.1989 § 396.3; Emergency Medical Technician, 63 O.S.1981 § 330.74; Foresters, 59 O.S.1981 § 1212; Electrician and Electrical Contractor, 59 O.S.Supp.1982 § 1685; Cosmetologist, 59 O.S.Supp.1985 § 199.7; Insurance Agent, Solicitor and Broker, 36 O.S.Supp.1988 § 1425; Nurse, 59 O.S.1981 § 567.5; Nurse Anesthetist, 59 O.S.Supp.1988 § 567.51; Optometrist, 59 O.S.1981 § 584; Osteopath, 59 O.S.Supp. 1983 § 633; Physical Therapist, 59 O.S.Supp. 1987 § 887.7, Physicians, 59 O.S.Supp.1987 § 493; Plumbers, 59 O.S.1981 § 1006; Podiatrist, 59 O.S.1981 § 144; Polygraph Examiner, 59 O.S.Supp.1985 § 1458; Pruner, 2 O.S.1981 § 3–272; Psychologist, 59 O.S.Supp.1984 § 1366; Public Adjuster, 36 O.S.Supp.1983 § 6206; Real Estate Broker, 59 O.S.Supp.1982 § 858–303; Schoolteachers, 70 O.S.Supp.1982 § 6–154; Social Worker, 59 O.S.Supp.1987 § 1261.1; Speech Pathologist and Audiologist, 59 O.S.Supp.1982 § 1605; Veterinarians, 59

O.S.Supp.1989 § 698.9, Occupational Therapist, 59 O.S.Supp.1984 § 888.6; Building and Construction Inspector, 59 O.S.Supp.1989 § 1036; Security Guards and Private Investigators, 59 O.S.Supp.1989 § 1750.6, Mechanical Contractor, 59 O.S.Supp.1987 § 1850.8.

The medical profession has faced this problem by the development of an alternative system for providing medical service for indigents. The establishment of free clinics, a welfare system which provides medical care and/or medical insurance and federally funded medical care programs have alleviated most of the need to compel physicians to donate their services. Christensen, "The Lawyer's Pro Bono Publico Responsibility", 1981 Am.B.Found. 1, 18–19 (1981). This is further amplified by the Department of Human Services which provides partial payment to the physicians and hospitals that service the indigents. See Department of Human Services Provider Manual.

**15.** B. Bohle, *The Home Book of American Quotations,* p. 180 (Dodd, Mead & Co.1967) (quote from John Adams).

**16.** *McLaughlin v. Western Casualty and Sur. Co.,* 603 F.Supp. 978, 980–81 (S.D.Ala.1985).

**17.** *In re Wright,* 131 Vt. 473, 310 A.2d 1, 7, 92 A.L.R.3d 639, 647–48 (1973).

**18.** *Cate v. Archon Oil Co.,* 695 P.2d 1352, 1356 (Okla.1985).

yer to appear and to show cause without penalty, why he/she should not be appointed to represent an indigent defendant. This is in accord with the unpublished order of this Court, promulgated July 13, 1987, *Pitts v. Wolfe,* No. 67,114. In *Pitts,* we refused to assume original jurisdiction to prohibit the enforcement of the order issued by a trial judge in the Seventeenth Judicial District. The trial court had appointed a lawyer, whose primary practice was in the Seventh Judicial District, to represent an indigent defendant evidently because he had listed his name in the Hugo, Oklahoma, telephone directory. We noted that the exercise of the power was specifically authorized by 22 O.S.Supp.1985 § 464(A), and that the petitioner had an adequate remedy in the trial court to challenge the order of appointment on the grounds that he could not adequately represent the indigent defendant. This is also in accord with the Model Rules of Professional Conduct, 5 O.S.Supp.1988 Ch. 1, App. 3–A, Rule 6.2 and the committee comments thereto,[19] which provide that a lawyer may refuse an appointment for the representation of an indigent upon a showing of good cause.

 We find that good cause consists of, but is not limited to the following factors: 1) the lawyer is not qualified to provide competent representation; 2) the representation will result in a conflict of interest; and 3) the case is so repugnant to the lawyer that it would impair either the attorney-client relationship or the lawyer's ability to represent the client.[20] We also find that Rule 1.16 of the Model Rules of Professional Conduct, 5 O.S.Supp.1988 Ch. 1, App. 3–A, is applicable to all client representation, and that it should be construed with the "good cause" factors. This rule provides that a lawyer may refuse to represent a client if: 1) the representation would violate the Rules of Professional Conduct or other law; 2) the lawyer's physical or mental condition materially impairs the lawyer's representation of the client; 3) the client persists in conduct involving the lawyer's service which the lawyer believes is criminal or fraudulent; 4) the client has used the lawyer's services to perpetrate a crime or fraud; or 5) the client discharges the lawyer.[21]

 The efficient administration of justice and judicial pragmatism, as well as the constitutional rights of indigent defendants, requires the continuation of court appointments of private counsel for indigent defendants. The due process clause of the Oklahoma Constitution forbids such appointments unless provisions are made for adequate, speedy, and certain compensation. Our holding today would prohibit both the appointment of counsel to represent indigents without a post-appointment opportunity to show good cause why the appointment should not be accepted and the appointment of counsel without just compensation. Providing for adequate funding for indigent representation is a matter for legislative action.

19. Title 5 O.S.Supp.1988 Ch. 1, App. 3–A, Rule 6.2 provides:
"A lawyer shall not seek to avoid appointment by a tribunal to represent a person except for good cause, such as:
(a) representing the client is likely to result in violation of the Rules of Professional Conduct or other law;
(b) representing the client is likely to result in an unreasonable financial burden on the lawyer; or
(c) the client or the cause is so repugnant to the lawyer as to be likely to impair the client-lawyer relationship or the lawyer's ability to represent the client."

20. Under the guides adopted today section (b) is unnecessary because just compensation has been provided.

21. Title 5 O.S.Supp.1988 Ch. 1, App. 3–A, Rule 1.16 provides in pertinent part:
"(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:
(1) the representation will result in violation of the Rules of Professional Conduct or other law;
(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client;
(3) the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;
(4) the client has used the lawyer's services to perpetrate a crime or fraud; or
(5) the lawyer is discharged...."

## II.

## APPOINTMENT OF COUNSEL

■ For all practical purposes, 19 O.S. 1981 § 137.1 and 19 O.S.Supp.1989 § 138.1 exempt attorneys in counties which have public defenders' offices from representing indigent defendants in state courts. Lawyers in these counties are subject to appointment only when a conflict of interest arises in the public defender's office.[22] Currently, these attorneys are neither faced with impending financial disaster nor forced to ignore their practice in order to provide effective counsel for an indigent. Except in rare circumstances, these attorneys have been granted an "immunity" by the legislature.

The representation of indigent defendants is a state-wide problem. The problem is not confined to the geographical limits of the individual counties in the state. The Okla. Const. art. 5, § 51, provides that "the Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this State." This constitutional provision was enacted to preserve equality between citizens who are similarly situated.[23] By enacting 19 O.S. 1981 § 137.1 and 19 O.S.Supp.1989 § 138.1, the Legislature created an exemption for attorneys who practice in counties which qualify for public defender's offices. Attorneys who practice in non-qualifying counties are required to shoulder indigent representation without regard to overhead expenses or the loss of business.[24]

The questions posed under § 51 are whether the attorneys are similarly situated and whether the attorneys are treated equally. When the facts are applied to the constitutional provision, we find that the lawyers are all members of the Oklahoma Bar Association and, as such, they are licensed to practice law in the state of Oklahoma. Because lawyers who practice in certain counties are immunized from the representation of indigent defendants, not all Oklahoma lawyers are treated equally. We also find that discrimination between attorneys who may be forced to represent indigent defendants based solely on the population of the county in which they practice law is unconstitutional under any level of scrutiny.[25]

However, we note as a practical matter, that to prevent unnecessary expenses for transportation and logistical costs, trial courts should first utilize voluntary pools and the lawyers who maintain an office or practice regularly within the judicial district in which the appointment is to be made. In the event the appointing judge finds it necessary to look beyond the judicial district in which the judge sits an appointment may be requested from the Presiding Judge of an attorney selected from within that administrative district. Should that not result in an appointment, the judge may request an appointment from the state bar at large from the Chief Justice. Appointments made by Special or Associate District Judges should be from attorneys who office within the county, but if such judge finds it necessary to look beyond the county, the judge may make such a request of the Chief District Judge, who shall proceed according to the order of priority for potential appointments set out above.

## III.

## THE FORMATION OF VOLUNTARY POOLS TO REPRESENT INDIGENT DEFENDANTS IS ENCOURAGED.

Attorneys are licensed by the Supreme Court of the State of Oklahoma to practice

---

**22.** Title 22 O.S.1981 § 1271 provides in pertinent part:
 "... If two or more indigent defendants are charged conjointly, and the public defender cannot justly defend both, the court may appoint and compensate counsel as provided above."

**23.** *Kimery v. Public Serv. Co.,* 622 P.2d 1066, 1071 (Okla.1980); *Roberts v. South Oklahoma*

*City Hosp. Trust,* 742 P.2d 1077, 1084 (Okla. 1986) (Opala, J., concurring opinion).

**24.** Thirty nine counties do not qualify by population to have a public defender's office.

**25.** *Reynolds v. Porter,* 760 P.2d 816, 822–23 (Okla.1988).

law, and an attorney owes his/her first duty to the Court. Likewise, the Court has an immediate interest in the character and the function of the bar—a good bar is necessary for a good bench.[26] We applaud individual attorneys or associations of attorneys who volunteer to provide either pro bono legal representation or representation of indigent defendants at rates which may be drastically under the market value of the lawyers skills and services. It reflects pride in the practice of law, and it exemplifies the best of many virtues found in the practicing bar. The provision of legal services to indigents is one of the responsibilities assumed by the legal profession, and personal involvement in the problems of the disadvantaged can be one of the most rewarding experiences in the life of a lawyer.

Every lawyer, regardless of professional prominence or professional workload, should find time to participate in or otherwise support the provisions of legal services to the disadvantaged.[27] We strongly urge the continuation of these services. We believe that attorneys would voluntarily donate their skills and services were they not unduly burdened with compulsory appointments.[28] We also believe that Oklahoma lawyers will form local, county, district, and intra-state voluntary pools to assume this responsibility and to relieve lawyers who practice in counties with few lawyers from an unfair court-imposed case load. We also recognize that at this time voluntary services are insufficient to accomodate the right of indigent citizens to the effective assistance of counsel where that right is implicated.

## IV.

### COMPUTATION OF FEES

■ The State of Oklahoma has the obligation to furnish counsel for indigents charged with: felonies; misdemeanors when imprisonment upon conviction is a real possibility; juvenile proceedings which may result in commitment to an institution; mental health matters;[29] contempt proceedings;[30] and guardianship matters.[31] The State also has an obligation to pay appointed lawyers sums which will fairly compensate the lawyer, not at the top rate which a lawyer might charge, but at a rate which is not confiscatory, after considering overhead and expenses. The basis of the amount to be paid for services must not vary with each judge; rather there must be a statewide basis or scale for ascertaining a reasonable hourly rate in order to avoid the enactment of a proscribed special law.[32]

---

**26.** *In re Integration of State Bar,* 185 Okla. 505, 95 P.2d 113–14 (1939).

**27.** See Offical Committee Comments to 5 O.S. Supp.1988 Ch. 1, App. 3–A, Rule 6.1.

**28.** Recently, in *Federal Trade Comm. v. Superior Court Trial Lawyers Assoc.,* 493 U.S. ——, ——, 110 S.Ct. 768, 778, 107 L.Ed.2d 851, 869 (1990), the United States Supreme Court discussed the issue of underpaid attorneys who represent indigents. This case, which is distinguishable from the one under consideration, involved a pool of attorneys who voluntarily represented indigents in Washington, D.C. After the lawyers became dissatisfied with the fees paid for their services, they refused to take new assignments. The United States Supreme Court held that this boycott constituted a horizontal arrangement among competitors resulting in a restraint of price and output in violation of the antitrust laws. Here, the attorneys have received mandatory appointments; they did not volunteer for the appointment; and the lawyers are not boycotting indigent representation.

**29.** Title 22 O.S.Supp.1983 § 1175.2(B)(4) provides:

"4. That if the person whose competency is in question does not have an attorney, the court will appoint an attorney for the person who shall represent him until final disposition of the case;".

**30.** See note 7, supra.

**31.** See note 8, supra.

**32.** Okla. Const. art. 5, § 46 provides in pertinent part:

"The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:

. . . . .

Regulating the practice or jurisdiction of, or changing the rules of evidence in judicial proceedings or inquiry before the courts, justices of the peace, sheriffs, commissioners, arbitrators, or other tribunals, or providing or changing the methods for the collection of debts, or the enforcement of judgments or prescribing the effect of judicial sales of real estate; ..."

■ Although we invite legislative attention to this problem, in the interim, we must establish guides which will apply uniformly without either violating due process rights or granting constitutional immunites. *Bias* provided some relief to Oklahoma lawyers; however, it did not address the constitutional infirmities which are squarely presented here. Therefore, in order to correct the defects which render the present statutory scheme unconstitutional, we must build on the foundation which was laid in *Bias*. We find that the most even handed approach in setting fees is to tie the hourly rate of the counsel appointed for the indigent defendant to the hourly rate of the prosecutor/district attorney and the public defenders.[33]

Before the 1988 amendment to 19 O.S. Supp.1988 § 215.30(B)(2), the salary of a district attorney was based on population in the district. After the amendment, the statute provided that all district attorneys receive the same salary—$56,180.00 per year or $29.26 per hour. We find that the trial court may award the attorney from $14.63 to $29.26 based on the attorney's qualifications. This range is tied to the salary range paid to assistant district attorneys and the district attorneys.[34] (As a matter of course, when the district attorneys' and public defenders' salaries are raised by the Legislature so, too, would the hourly rate of compensation for defense counsel.) The overhead and the litigation expense of the district attorney are furnished by the state. In order to place the counsel for the defense on an equal footing with counsel for the prosecution, provision must be made for compensation of defense counsel's reasonable overhead and out of pocket expenses.

■ However, before the lawyer can be compensated for overhead, the percentage of reasonable hourly overhead rate di-

---

Okla. Const. art. 5, § 59 provides:
"Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted."
*State v. Goforth,* 772 P.2d 911, 914 (Okla. 1989); *Reynolds v. Porter,* see note 25, supra.; *Maule v. Independent School Dist. No. 9,* 714 P.2d 198, 204 (Okla.1985).

**33.** Prior to the 1988 amendment, the district attorney's salaries were based on population in the districts. Under 19 O.S.Supp.1988 § 215.30(B)(2) all district attorneys receive the same amount. Section 215.30(B)(2) provides in pertinent part:
"B. ... the annual compensation, payable monthly, of each district attorney shall be as follows: ...
2. For the period commencing in January, 1989 and ending in December, 1990, the sum of Fifty-six Thousand One Hundred Eighty Dollars ($56,180.00)."
The hourly rate was determined by $56,180.00 being divided by the twelve months in a year then divided by 160 hours for each month. Currently the public defender's salary is tied to the district attorney's salaries.
Title 19 O.S.1981 § 137.2 provides for the salary for public defenders in counties of 24,727 —60,000 in population. It provides in pertinent part:
"... The public defender ... shall be paid from the funds in the county General Revenue Fund an amount to be determined by the board of county commissioners which amount shall not be in excess of ninety per-

cent (90%) of the salary of the district attorney of such county ..."
Title 19 O.S.1981 § 138.4 provides for the salary for public defenders in counties over 200,-000 in population. It provides in pertinent part:
"(a) ... a public defender on a full-time basis ... shall receive a salary commensurate with the salary received by the district attorney in said district, ..."

**34.** Title 19 O.S.Supp.1988 § 215.34 provides in pertinent part:
"A. Effective January 1, 1983, full time assistants with less than one (1) year of experience ... shall receive a salary of not more than fifty percent (50%) of the salary of the district attorney of the district. Full-time assistants with over one (1) but less than two (2) years of experience shall receive not more than seventy percent (70%) nor less than fifty percent (50%) of the salary of the district attorney of the district. Full-time assistants with over two (2) years of experience but less than three (3) years of experience shall receive not more than eighty percent (80%) nor less than fifty percent (50%) of the salary of the district attorney of the district. Full-time assistants with over three (3) years of experience shall receive a salary of not more than ninety percent (90%) and not less than fifty percent (50%) of the salary of the district attorney of the district; except that the designated first assistant with over three (3) years of experience may receive up to ninety-five percent (95%) of the salary of the district attorney...."

rectly attributable to the case in controversy, and the amount of out-of-pocket expenses incurred, must be presented to the trial court.[35] **These items, in addition to the range of $14.63 to $29.26 an hour for the lawyers' services, must be considered in setting counsel fees.** Obviously, the trial court is charged with the duty to ascertain whether the number of billable hours were reasonably necessary to the provision of a defense by competent counsel. (These fees are also subject to final approval by the Chief Justice.)[36] Currently, the statute, 22 O.S.Supp.1985 § 464, provides for a $750.00 limit on payment of costs. If these costs exceed this amount, they will not be paid unless defense counsel petitions the court for approval of extraordinary expenses *before* they are incurred. To receive payment for the reasonable overhead, attorney fees, and out of pocket expenses charged to the case, the lawyer must present accurate itemizations of overhead expenditures, time sheets, and invoices to support the number of hours reasonably spent on the defense.

■ Mattingly and Pyron have complied with the guidelines we are establishing. Were this not so, we would remand for further proceedings. We find that they are seasoned lawyers who should be paid an hourly rate of $29.26 per hour; that the average overhead rate and out of pocket expenses presented are reasonable; and that the lawyers spent the time alleged in the pursuit of Lynch's defense. The trial court approved counsel fees in the amount of $17,073.03 for Mattingly and $10,995.00 for Pyron. Our computation results in a smaller fee than that which was allowed by the trial court.

| Calculation of Fees | |
|---|---|
| Mattingly's out-of-pocket expenses | $ 173.03 |
| Average hourly overhead $50.88 @169 hours | 8,598.72 |
| Hourly rate $29.26 @169 hours | 4,944.94 |
| Total compensation | $13,716.69 |
| | |
| Pyron's average overhead $48.00 @109.55 hours | $ 5,258.40 |
| Hourly rate $29.26 @109.55 hours | 3,205.43 |
| Total compensation | $ 8,463.83 |

Since *Bias,* attorneys representing defendants charged with capital crimes[37] have been awarded extraordinary expenses and attorney fees. This extraordinary compensation has been calculated under a formula devised by former Chief Justices of Oklahoma in cooperation with the Administrative Director of the Courts. As a practical matter, the fees which have been awarded have been in the range we have adopted today.

## CONCLUSION AND EFFECTIVE DATE OF DECISION

After reaching the conclusion that the provision of counsel fees for Lynch under 21 O.S.Supp.1985 § 701.14, was constitutionally infirm, our duty is unmistakable.[38] Under the unusual circumstances presented here, and because of this Court's direct and inherent constitutional power[39] to regulate the practice of law in Oklahoma, we conclude that "weighty counterveiling policies"[40] and considerations of judicial economy are best served by addressing the merits in both Cause No. 74,259 and Cause No. 74,319. This treatment will avoid confusion and disorder, and it will negate endless litigation on case by case basis.

We held, in *In re Integration of State Bar,* 185 Okla. 505, 95 P.2d 113 (1939), that the primary duty of courts is the proper and efficient administration of justice; that lawyers are an important part of the judicial system of this state; and that the inherent power to define and regulate its practice naturally and logically resided in

**35.** *State ex rel. Stephan v. Smith,* 242 Kan. 336, 747 P.2d 816, 849 (1987).

**36.** See 20 O.S.Supp.1989 § 1304.

**37.** Capital cases are ones in which the death penalty is sought. See 21 O.S.Supp.1985 § 701.14.

**38.** *Vanderpool v. State,* 672 P.2d 1153, 1157 (Okla.1983).

**39.** *In re Integration of State Bar,* see note 26, supra. Opala, " 'Inherent' Powers of the Judiciary", American Academy of Judicial Education—Judicial Independence & Separation of Powers Conference Materials (May 21–26, 1989).

**40.** *Broadrick v. State,* 413 U.S. 601, 611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 839 (1973); *NAACP v. Alabama,* 357 U.S. 449, 459–60, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488, 1498 (1958).

the Oklahoma Supreme Court because the practice of law was so intimately connected and bound up with the exercise of judicial power in the administration of justice.[41] The Okla. Const. art. 7, §§ 4 and 6 explicitly endows this Court with the power of general superintending control and general administrative authority over all inferior courts in this State.[42] The Court is constitutionally vested with the power to control and regulate the practice of law in this State,[43] and it regulates, among other things: 1) the moral, educational and residential qualifications for admission to the bar;[44] 2) the necessity of taking a bar examination;[45] 3) the requirement that attorneys belong to the Oklahoma Bar Association;[46] 4) mandatory continuing legal education;[47] and 5) the standards and procedures for discipline of attorneys.[48]

▆▆▆▆ Because of our constitutional responsibilities relating to the managerial and superintending control of the district courts and of the practice of law; because of the inherent power of this court to define and regulate the practice of law; and because of the public nature, and the certainty of reoccurrence of the problem presented, we must declare the compulsory appointment of lawyers without providing a post-appointment opportunity to show cause why they should not be required to accept the appointment, or without providing adequate, speedy, and certain compensation for such representation, an unconstitutional taking of private property. We must also adopt guidelines for the trial courts to follow in setting fees for representation of indigent defendants in all cases where the state of Oklahoma is required to provide such representation in order to avoid the unequal, erratic, unconstitutional taking of private property which might occur if fees are set by a different formula in each of the state's seventy-seven counties. We find that our constitutional duties are met by assuming this responsibility rather than by delegating it to ad-

**41.** *Archer v. Ogden*, 600 P.2d 1223, 1227 (Okla. 1979).

**42.** Okla. Const. art. 7, § 4 provides in pertinent part:
"... "The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law...."
Okla. Const. art. 7, § 6 provides in pertinent part:
"... general administrative authority over all courts in this State, ... is hereby vested in the Supreme Court ...""

**43.** *Tweedy v. Oklahoma Bar Assoc.*, 624 P.2d 1049, 1052 (Okla.1981).

**44.** Title 5 O.S.1981 § 12 provides:
"The Supreme Court of the State of Oklahoma shall have exclusive power and authority to pass upon qualifications and fitness of all applicants for admission to practice law in the State of Oklahoma, and the qualifications of such applicants shall be those which are now or may be hereafter prescribed by the statutes of Oklahoma and the rules of the Supreme Court."

**45.** Title 5 O.S.1981 § 16 provides:
"Within thirty (30) days after this act takes effect, the Supreme Court shall examine applicants for admission to the bar and all applicants who have heretofore been passed upon and allowed to take the examination of the Committee of State Bar Examiners shall be eligible for examination by the Supreme Court at its first examination, and thereafter the Supreme Court shall hold examinations for applicants at least twice each year and at such other times as the Supreme Court may prescribe."

**46.** Title 5 O.S.1981 Ch. 1, App. 1, art. 2, § 7(a), provides:
"(a) No attorney shall practice law in the State of Oklahoma who is not an active member of the Association, except as herein provided."

**47.** Title 5 O.S.Supp.1986 Ch. 1, App. 1–B, Rule 3 provides:
"Each attorney subject to these rules pursuant to Rule 2 herein shall attend, or complete an approved substitute for attendance, a minimum of twelve (12) hours of approved continuing legal education each calendar year beginning January 1, 1986."

**48.** Title 5 O.S.1981 § 13 provides:
"The Supreme Court of the State of Oklahoma shall have the exclusive power and authority to discipline attorneys and counselors at law or revoke the permit to practice law granted to attorneys and counselors at law and the rules of conduct of attorneys and counselors at law in this state shall be such as are now or may hereafter be prescribed by the statutes of Oklahoma and the rules of the Supreme Court."

ministrative personnel who are answerable neither to the constitution nor to the people.

Certainly, the framers of the constitution did not intend to obliterate the due process rights of lawyers in order to protect the constitutional rights of indigent defendants. An attorney cannot be forced to accept the appointment to represent indigent defendants without a meaningful post-appointment opportunity to show good cause why the assignment is unacceptable. We believe that by providing a post-appointment due process hearing, and by assuring adequate, speedy, and certain payment for the legal services, that the representation of an indigent defendant by court appointed counsel will not result in an unconstitutional taking of private property without due process of law and that the indigent defendant, the bench, the bar, and the public will be better served.

■ However, as we noted above, the provision of counsel for indigent defendants, and the compensation of such counsel also lie within the Legislative sphere, and its consideration of the myriad problems presented is invited. This is an important area, which the Legislature should act to address. Nevertheless, until such time as the Legislature considers these matters, pursuant to the constitutional power granted by art. 7, §§ 4 and 6 of the Oklahoma Constitution, these guidelines shall become effective in all cases in which the State of Oklahoma is required to provide assistance of counsel insofar as the appointment of counsel and the implementation of post-appointment show cause hearings are concerned upon the issuance of the mandate herein. The computation of fees in all *capital* cases shall also be calculated according to the promulgated guidelines after the issuance of the mandate. However, under the authority of *Vanderpool v. State*, 672 P.2d 1153, 1157 (Okla.1983), recovery of attorney fees under the new guidelines will not be effective in *non-capital* cases until August 24, 1992, to allow the Legislature to address the problem, and to enact corrective legislation.

ORIGINAL JURISDICTION ASSUMED

JUDGMENT OF THE TRIAL COURT AFFIRMED AS MODIFIED IN CASE NO. 74,319.

HARGRAVE, C.J., HODGES, LAVENDER, ALMA WILSON and SUMMERS, JJ., concur.

OPALA, V.C.J., concur in part, dissent in part.

SIMMS and DOOLIN, JJ., dissent.

ALMA WILSON, Justice, concurring specially:

I applaud this Court's extension of *Bias v. State*, 568 P.2d 1269 (Okla.1977) and write specially to express my preference for appointments of counsel for the indigent from pools of private attorneys, rather than extending the prohibitively expensive public defender system.

HODGES, Justice, concurring specially.

I concur in today's decision which holds that requiring lawyers to represent indigent defendants without a post-appointment hearing, and without providing adequate, speedy, and certain compensation, violates the Oklahoma Constitution. The present application of the compulsory court appointment system may also violate the due process and equal protection clauses of the United States Constitution.

I write specially to state that today's decision is merely a stopgap measure to remedy constitutional infirmities in the present system. The Legislature is free to adopt any solution that is consistent with the Oklahoma and United States Constitutions.

For example, the Legislature may adopt the formula suggested by the majority opinion by tying the hourly rate of appointed counsel to that of district attorneys and public defenders while compensating for reasonable overhead and out-of-pocket expenses. Or, the Legislature may opt to develop a state-wide public defender system as suggested by the concurring in part and dissenting in part opinion. Another alternative would be to simply raise the

statutory cap and codify the extraordinary circumstances doctrine applied in *Bias v. State*, 568 P.2d 1269 (Okla.1977).

Today's pronouncement is another chapter in the judicial struggle across the nation "to find the appropriate balance between the ethical obligation of the legal profession to make services available and the rights of attorneys to just compensation." *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816, 841 (Kan.1987). Recent cases recognize "that the historical conditions from which the duty to provide free legal services evolved no longer exists [sic] in modern America." *Id.*

Dramatic changes have impaired the traditional method of compensation and appointment of counsel to represent indigent defendants. Recent years have witnessed increased complexity, specialization, and costs in criminal defense work. Added to this, the "War on Drugs" is fueling a dramatic increase in the number of criminal cases heaped upon an already heavily burdened system.[1] These exacerbating factors have led to the emerging view "that the responsibility to provide the Sixth Amendment right to counsel is a public responsibility that is not to be borne *entirely* by the private bar." *Id.* Although lawyers have an ethical obligation to provide services for indigents, the legal obligation rests on the state. It is up to the Legislature to fulfill that obligation.

**OPALA, Vice Chief Justice, concurring in part and dissenting in part.**

The court pronounces today that the statutory assignment scheme which requires that lawyers represent indigent defendants in criminal—and in certain civil—cases, while not facially infirm, may be unconstitutional in its present-day application. In a proceeding for corrective relief from the trial judge's order, which approved two lawyers' fees in an amount exceeding the statutory maximum rates for criminal defense work, the court today (1) modifies the trial court's order by reducing the hourly rate to the level of pay drawn by district attorneys/public defenders and their assistants, (2) approves the amount claimed by the lawyers for overhead and out-of-pocket expenses and (3) adopts guidelines for trial courts to apply in future assignments of counsel.

I join in concluding that the regime of assigning lawyers for criminal defense work in counties which are without public defender services is tainted by a constitutional infirmity. I recede from the court's interim institutional design that is to govern until the legislature overhauls the system. In my view, the whole scheme is affected by a fatal and incurable flaw. It saddles the judiciary with the responsibility of operating defense services in 75 counties—a function properly to be performed by the executive department. Until the legislature establishes a professionally independent statewide public defender system within the executive department, I would, merely as a stopgap measure, (1) develop guidelines that would equalize, on a statewide basis, the Bar's burden for providing defense services in those 75 counties and (2) call upon the Oklahoma Bar Association [hereafter called the Bar] to manage a statewide service pool of qualified lawyers for deployment in criminal as well as other mandated public-service work.

I

A SYSTEM THAT IMPOSES EXECUTIVE DUTIES UPON THE JUDICIAL SERVICE VIOLATES ART. 4, § 1, OKL. CONST.[1]

The threshold issue here is the constitutional propriety of placing in the judicial department the executive function of managing professional resources for deployment in the defense of criminally accused

---

1. One statistic demonstrates this point. During the last ten years, the rate of incarceration has increased from 230 per 100,000 citizens to 407. The United States now has one of the highest incarceration rates in the world. This figure compares with a rate of 350 to 400 in the U.S. S.R., 100 in Britain, 92 in France and 47 in Norway. Tulsa World, July 9, 1990, at 1.

1. See *infra* note 11.

indigent persons.[2] In a series of pronouncements enforceable against the states, the U.S. Supreme Court has imposed on state governments the burden of providing *defense services for indigent persons* who stand charged (a) with a felony, (b) in misdemeanor prosecutions involving loss of liberty and (c) with a juvenile delinquency.[3] The penalty for noncompliance is federal invalidation of state convictions. The Oklahoma legislature's present-day response to the U.S. mandate consists of (1) authorizing public defender services in some, but not all, counties,[4] (2) directing the judiciary to assign counsel for indigent defendants in certain criminal and civil proceedings[5] and (3) establishing a maximum statutory compensation rate for court-procured defense services.[6]

In obedience to the legislative and federal constitutional mandates, the judiciary has furnished manpower for defense services (a) in counties where no public defender system exists, (b) in all cases where a conflict of interest disqualifies the public defender from serving and (c) in certain noncriminal cases. In my view, the *entire* assignment regime's institutional design for provision of legal service is constitutionally infirm. It imposes on the judicial service the responsibility of managing professional human resources for necessary deployment in the executive service of State government—i.e., the defense of indigent persons.

The principal function of the judiciary is to preside over the adjudicative process with a view to ensuring that the proceedings are error-free. It does not include procuring lawyers to make the process meet 6th Amendment, or other legal, standards.[7] Defense services the State is constitutionally mandated to provide are clearly executive in character.[8] The Oklahoma Supreme Court's "superintending control" under Art. 7, § 4, Okl. Const.,[9] is neither *managerial* nor *administrative* but purely *adjudicative* in character.[10] Its terms will not support this court's ukase for the judiciary's involuntary assumption of managerial responsibilities extraneous to the discharge of its governmental service.

Judicial exercise of managerial power over the defense service in criminal cases clearly offends the separation-of-powers

---

**2.** Defense services are typically provided under three methods: 1) assigned counsel programs, 2) public defender offices and 3) contract delivery systems. ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services, Approved Draft 1968, Commentary (a).

**3.** *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 [1963]; *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 [1972]; *Application of Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 [1967].

**4.** 19 O.S.1981 § 137.1 and 19 O.S.Supp.1989 § 138.1.

**5.** See 22 O.S.Supp.1983 § 1175.2(B)(4) (competency to stand trial); 22 O.S.Supp.1985 § 464 (arraignments).

**6.** See 21 O.S.Supp.1985 § 701.14 (maximum statutory fee in capital cases); 22 O.S.1981 § 1271 (other criminal cases); 20 O.S.Supp.1989 § 1304(b)(9) (guardianship cases); 10 O.S.Supp. 1989 § 24(B) (juvenile proceedings).

**7.** *I perceive no difference between the statutorily mandated judicial procurement of professional resources for deployment in the defense of the accused indigent persons and a legislative command that the judiciary supply a staff of lawyers* for the Governor, or for any other executive or legislative office.

In *Bradshaw v. Ball,* 487 S.W.2d 294, 299 [Ky. 1972], the court notes that "it is the duty of the executive department to enforce the criminal laws, and it is the duty of the legislative department to appropriate sufficient funds to enforce the laws which they have enacted. The proper duty of the judiciary, in the constitutionally ideal sense, is neither to enforce laws nor appropriate money. *The judiciary's reason for existence is to adjudicate."* (Emphasis added.)

**8.** *Earl v. Tulsa County Dist. Court,* Okl., 606 P.2d 545, 547 [1980]; see also *Polk County v. Dodson,* 454 U.S. 312, 334, 102 S.Ct. 445, 458, n. 5, 70 L.Ed.2d 509 [1981] (Burger, C.J., concurring).

**9.** Art. 7, § 4, Okl. Const., provides in pertinent part:

" * * * The original jurisdiction of the Supreme Court shall *extend to a general superintending control* over all inferior courts and all Agencies, Commissions and Boards created by law. * * *" (Emphasis mine.)

**10.** In Re: Approval of Rules Mandated by the Dispute Resolution Act, 12 O.S.Supp.1985 §§ 1801 et seq., 57 OBJ 876 [April 8, 1986] (Opala, J., not participating).

doctrine enjoined on this government by Art. 4, § 1, Okl. Const.[11] That section prohibits the judiciary's unauthorized incursion into the affairs of the executive branch.[12] Our fundamental law explicitly prohibits a judge from exercising functions incompatible with (or not germane to) the Bench's *constitutionally articulated mission* and with the mandated *posture of detachment and neutrality.*[13] *The judiciary cannot permit itself to have any greater degree of operational entangle-ment with defense services than that which marks out its involvement with the prosecution.*[14]

The law must insulate from *anyone's* interference—judicial, legislative or executive—*all* aspects of a public defender's attorney/client relationship. The litigation-related strategy choices, as well as any other facet of professional decision-making in the conduct of a person's defense, must be beyond the pale of outsiders' meddling.[15]

**11.** A tripartite division of government is not explicitly mandated by the U.S. Constitution; our fundamental law, Art. 4, § 1, Okl. Const., expressly and inflexibly commands that the functions of government be divided into three departments. *Sterling Refining Co. v. Walker,* 165 Okl. 45, 25 P.2d 312, 320 [1933]. The terms of Art. 4, § 1, Okl. Const. are:
"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others."
In the federal judicial system the principle of separation of powers came to be recognized and enforced when the U.S. Supreme Court held that executive or administrative duties of a non-judicial nature may not be imposed on judges holding office under Art. III of the federal Constitution. *The United States v. Ferreira,* 54 U.S. 40, 13 How. 40, 14 L.Ed. 42 [1851]; *Hayburn's Case,* 2 U.S. 409, 2 Dall. 409, 1 L.Ed. 436 [1792]; for a more recent exposition of the Court's view on proper distribution of government functions see *I.N.S. v. Chadha,* 462 U.S. 919, 951–952, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 [1983].

**12.** *Earl v. Tulsa County Dist. Court, supra* note 8; see also in this connection *Pulaski County ex rel. Mears v. Adkisson,* 262 Ark. 636, 560 S.W.2d 222, 223 [1978].
We should not be commingling the functions of this carefully designed constitutional structure. See In Re: Appeal of Rules Mandated by the Dispute Resolution Act, *supra* note 10 (Opala, J., nonparticipating), where this court approved rules and regulations for mediation services authorized by the Dispute Resolution Act which placed the management of mediation services in the Judicial Department; see also in this connection the views of Scalia, J., in dissent from the Court's opinion in *Morrison v. Olson,* 487 U.S. 654, 697, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 [1988] (Scalia, J., dissenting) (where the Court upheld a congressional enactment that authorized court assignment of independent counsel to investigate and prosecute certain officials of the executive branch) and in *Mistretta v.*

*U.S.,* 488 U.S. 361, 109 S.Ct. 647, 675, 102 L.Ed.2d 714 [1989] (Scalia, J., dissenting) (where the Court approved congressional creation of a Sentencing Commission as an independent body of the Judicial Branch with power to promulgate binding Sentencing Guidelines).

**13.** *Earl v. Tulsa County Dist. Court, supra* note 8, 606 P.2d at 547; *Sterling Refining Co. v. Walker, supra* note 11; *Ex parte Coffelt,* 93 Okl.Cr. 343, 228 P.2d 199, 202–203 [1951]; *Galloway v. Truesdell,* 83 Nev. 13, 422 P.2d 237 [1967]; *Opinion of the Justices,* 365 Mass. 639, 309 N.E.2d 476, 480 [1974]; *Case of Supervisors of Election,* 114 Mass. 247, 249, 251 [1873].

**14.** *Earl v. Tulsa County Dist. Court, supra* note 8, 606 P.2d at 547.

**15.** The separate writing by Simms, J., *erroneously* ascribes to my institutional design the flaw of subjugating the defense to executive dictation. I fully recognize the *professional* independence of lawyers who, either as assigned counsel or as public employees, are called upon to defend. In *Polk County v. Dodson, supra* note 8, 454 U.S. at 321, 102 S.Ct. at 451, the argument was pressed that because public defenders are paid by the state, they are subject to "supervision by persons with interests unrelated to those of indigent clients." In refuting this notion, the Court stated that "a public defender is not amenable to administrative direction in the same sense as other employees of the State" and that "a defense lawyer is not, and by the nature of his function cannot be, the servant of an administrative superior." The Court noted that equally important "is the constitutional obligation of the State to respect the professional independence of the public defenders whom it engages." *Polk, supra* note 8, 454 U.S. at 321–322, 102 S.Ct. at 451. Burger, C.J., states in his concurring opinion in *Polk, supra* note 8, 454 U.S. at 327, 102 S.Ct. at 454, that under *Gideon* and *Argersinger* "the government undertakes only to provide a professionally qualified advocate *wholly independent of the government.* It is the independence from governmental control *as to how the assigned task is to be performed* that is crucial.... The obligations owed by the attorney to the client are defined by the professional

*Nevertheless*, the essence of the service to be provided is correctly characterized as extraneous to the judicial or legislative function and akin to that of the executive.[16] It is the executive's responsibility to seek reversal-proof convictions in judicial tribunals properly constituted to administer that standard of adjudicative process which conforms to the dictates of our fundamental law. In short, in the aftermath of *Gideon* and its progeny, defense, as much as prosecution, is an essential component of government service *for the enforcement of criminal laws.*

The legislature may not impose nonjudicial duties upon any judicial officer or tribunal, neither may it command the judiciary to recruit lawyers to be used for what is essentially the discharge of a purely executive function.[17] The exclusive, constitutionally invested power to requisition Bar resources for rendition of professional *pro bono* services resides in the Supreme Court.[18] Judges of other courts may exercise this power only to the extent delegated to them by this court.[19]

## II

## A PUBLIC DEFENSE SYSTEM FOR ONLY 75 COUNTIES, WHICH FAILS TO EQUALIZE THE PUBLIC–SERVICE BURDEN AMONG *ALL* LAWYERS IN THE STATE, OFFENDS OKLAHOMA CONSTITUTION'S COMMAND FOR EQUAL TREATMENT UNDER THE LAW IN ART. 2, §§ 6 AND 7[20] AND ART. 5, § 46[21]

There is no statewide mechanism for equalizing the public-service burdens imposed by the flawed assignment regime on lawyers in the 75 affected counties. The current practice—which weighs heavily on lawyers in some of these counties and immunizes from like service nearly all legal practitioners with offices in the largest two metropolitan counties—offends our State Constitution's uniformity-of-procedures clause, Art. 5, § 46,[22] as well as the equal treatment components infused into Art. 2, §§ 6 and 7.[23]

In the discharge of the Supreme Court's power to regulate the practice of law and

---

codes, not by the governmental entity from which the defense advocate's compensation is derived." (Emphasis mine.)

**16.** The new institutional design I would counsel should leave the judiciary with no greater power over the defense component than it customarily wields over the prosecution. In this framework the judicial role would recede to that of judicature. Once the public defense component is integrated into the executive department, either as an agency under an autonomous commission or otherwise, the independence of the defenders' professional decision-making process must receive no less respect than prosecutorial discretion.

**17.** In *Sterling Refining Co. v. Walker, supra* note 11, 25 P.2d at 320, the court held that "by reason of the provisions of article 4, §· 1, legislative powers could not be delegated to or conferred upon the Supreme Court of Oklahoma."

**18.** See Part II, *infra.*

**19.** The Supreme Court's inherent power over the Bar is nondelegable. *In re Integration of State Bar of Oklahoma, infra* note 24; *Winters v. City of Oklahoma City* (Opala, J., concurring in part and dissenting in part) *infra* note 26.

**20.** The provisions of Art. 2, § 6, Okl. Const., are: "The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for

every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice."

The terms of Art. 2, § 7, Okl. Const., provide: "No person·shall be deprived of life, liberty, or property, without due process of law."

**21.** The terms of Art. 5, § 46, Okl. Const., provide in pertinent part:

"The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing:

\* \* \*

*Regulating the practice or jurisdiction of, or changing the rules of evidence in judicial proceedings or inquiry before the courts,* justices of the peace, sheriffs, commissioners, arbitrators, or other tribunals...." [Emphasis mine.]

**22.** See *supra* note 21. *Maule v. Independent School Dist. No. 9*, Okl., 714 P.2d 198, 203–204, n. 32 [1985]; *Ind. Schl. Dist. v. Okl. City Fed. of Teachers*, Okl., 612 P.2d 719, 725 [1980] (Opala, J., dissenting); *Oklahoma City v. Griffin*, Okl., 403 P.2d 463, 465 [1965]; *Fenimore v. State*, 200 Okl. 400, 194 P.2d 852, 854 [1948].

**23.** See *supra* note 20. Our due process clause in Art. 2, § 7, Okl. Const., has a definitional sweep that is coextensive with its federal counterpart. See 5th and 14th Amendments, U.S. Const.; *McKeever Drilling Co. v. Egbert*, 170 Okl. 259, 40

in conformity with our fundamental law, I would create an *interim equalization design* for providing defense services that will *uniformly affect all Oklahoma lawyers.*[24] When the Bar was "integrated" in 1938, the profession became organized into a single governmental agency. All lawyers

became practitioners in *one* government-operated system of licensure, discipline and regulation.[25] With integration also came *deprivatization of the Bar.*[26] Lawyers are quasi-public functionaries[27] under the Supreme Court's rule-structured regime and are holders of a state occupational license.

P.2d 32, 35 [1935]; *Elam v. Workers' Compensation Court of State*, Okl., 659 P.2d 938, 941, 943 [1983] (Opala, J., dissenting); *Black v. Ball Janitorial Service, Inc.*, Okl., 730 P.2d 510, 513, n. 9 [1986]; *Harry R. Carlile Trust v. Cotton Petroleum*, Okl., 732 P.2d 438, 443, n. 25 [1986]; *Fair Sch. Finance Coun. of Okla. v. State*, Okl., 746 P.2d 1135, 1148, n. 48 [1987]. The latter (and hence our own) contains a built-in anti-discrimination component which affords protection against unreasonable or unreasoned classifications serving no "important governmental objective." *Davis v. Passman*, 442 U.S. 228, 234–235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 [1979]; *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 [1954]; see *State ex rel. State Bd., Etc. v. Naifeh*, Okl., 598 P.2d 225, 226 [1979] (Opala, J., dissenting). Our jurisprudence recognizes the equal-protection component in our own due process clause. *McKeever Drilling Co. v. Egbert, supra; Personal Loan & Finance Co. v. Oklahoma Tax Com'n.*, Okl., 437 P.2d 1015, 1019 [Okl.1968].

**24.** *Tweedy v. Oklahoma Bar Ass'n*, Okl., 624 P.2d 1049, 1052 [1981]; *In re Integration of State Bar of Oklahoma*, 185 Okl. 505, 95 P.2d 113 [1939]; *Ford v. Board of Tax–Roll Corrections*, Okl., 431 P.2d 423 [1967].

**25.** Whether the Oklahoma Bar should be deemed a "government agency," or some other quasi-public entity, for the purpose of determining its permissible expenditures under the 1st Amendment, need not be reached now. Suffice it to say here that the Bar's activities serve an *important public interest* in "regulating the legal profession and improving the quality of legal services." *Keller v. State Bar of California*, — U.S. —, 110 S.Ct. 2228, 2236, 110 L.Ed.2d 1 [1990]; see also *Tweedy v. Oklahoma Bar Ass'n, supra* note 24.

**26.** The deprivatization process underwent by the State Bar of Oklahoma is at variance with the common law's history. During the classical period of the common law, each court "licensed" its own practitioners. See generally Martineau, The Attorney As An Officer Of The Court: Time To Take The Gown Off The Bar, 35 S.Carol.L.Rev. 541 [1984]. The English Bar—unlike that of Oklahoma—was a private bar. The exclusive power of admitting candidates to the Bar of England was entrusted to the Inns of Court (independent, self-governing, unincorporated professional societies that trained students in the law). Admission to practice law in England could be accomplished by (a) *entering one*

*of the four Inns of Court* in London, (b) *completing the required legal training and* (c) *receiving a formal "call to the bar"* of the Inn of which the candidate was a member. A person called to the bar signed the Roll at his own Inn of Court and was tacitly permitted by the judges to practice in the courts. Costigan, Cases On The Legal Profession and Its Ethics, pgs. 12 and 86, n. 31 [1933]; Chroust, The Beginning, Flourishing and Decline of the Inns of Court: The Consolidation of the English Legal Profession After 1400, 10 Vanderbilt L.Rev. 79, 112 [1956]; II Holdsworth, A History of English Law 484–512 [4th Ed.1936]; Nolan, Readings in the History of the American Legal Profession at 15 [The Michie Company 1980] (an excerpt from Plucknett, A Concise History of the Common Law 224–230 [1956] ). Before 1868, there was no concept of a public license to practice law in England. Only lawyers who intended to practice in the King's overseas dominions, colonies, protectorates and mandated territories were required to sign an official roll kept at the Crown Office in the Law Courts' Central Office in the Strand. *Costigan, supra* at 87, n. 31; see also Chroust, The Rise of the Legal Profession in America, Vol. I at 33–35, n. 95, Vol. II at 171–172 [1965]. The English "call to the bar"—i.e., the admission to the bar of a private professional society—*has no modern equivalence in a government license to practice law.*

Oklahoma made a sharp break with history when in 1938 it organized lawyers into a state-wide bar under the auspices of this court and refashioned the profession into a regulated resource of the judiciary. See *In re Integration of State Bar of Oklahoma, supra* note 24; see also in this connection Nolan, *supra* at 177–178 (an excerpt from Hurst, The Growth of American Law: The Law Makers 285–293 [1950] ).

The federal and state practitioners are differently organized. In the federal judicial environment *each United States court* is authorized to establish and to control its own bar. 28 U.S.C. §§ 1654 and 2071; see *Frazier v. Heebe*, 482 U.S. 641, 107 S.Ct. 2607, 2611, 96 L.Ed.2d 557 [1987]; see also *Winters v. City of Oklahoma City*, Okl., 740 P.2d 724, 729 [1987] (Opala, J., concurring in part and dissenting in part).

**27.** "An attorney is neither a public officer nor an officer of the court, in any proper legal sense. He exercises a *quasi-public franchise*, a privilege, not under the court but under the law." (Emphasis added.) *Costigan, supra* note 26 at p. 83, n. 24. [1933].

Rulemaking for the Bar is the Supreme Court's exercise of its constitutionally invested power to regulate the legal profession and the practice of law. The authority over lawyers resides solely in the Supreme Court. It is spelled out in its rules.[28] The power to requisition lawyers for public service and to define the terms and conditions upon which the legal practitioners shall carry out their public duty lies within this court's exclusive authority over the profession.[29]

## III

### A BAR–MANAGED INTERIM PLAN FOR EQUALIZING THE DEFENSE SERVICE BURDEN

Until the legislative department establishes a statewide public defender service [30] that is both totally independent of the judiciary and impervious to judicial tinkering, I would exercise the court's constitutionally invested powers to develop an interim court-assignment system with a built-in mechanism for equalizing the burden among *all qualified practitioners* in the State.[31] I would call upon the Bar to manage this stopgap plan and to ensure an equal distribution of the government-service burden to be imposed.[32]

### Competence of lawyers for criminal work

I do not approve of developing competency standards through the *adjudicative process* of an appellate opinion. This task should be accomplished by rules and guidelines to be developed *in cooperation with the* representatives of the nisi prius Bench and the *Court of Criminal Appeals.* Those courts, which are more directly affected and vitally interested in the competence of the criminal bar, must participate in formulating these standards.

I would not treat lawyers' competence as a single concept applicable to *all* criminal proceedings. Criteria should be developed that will enable lawyers to qualify for misdemeanor defense, though perhaps they might not be so qualified for felony work. Some may be professionally fit for certain felony defense service but not for all—e.g., robbery but not capital homicide offenses. Lastly, there may be those who qualify for the defense in juvenile delinquency or in some other case under the rubric of juvenile process. In other words, competency standards for assignments must neither be

**28.** *Tweedy v. Oklahoma Bar Ass'n, supra* note 24 624 P.2d at 1052; *Supreme Court of Virginia v. Consumers Union, Etc.,* 446 U.S. 719, 731–732, 100 S.Ct. 1967, 1974, 64 L.Ed.2d 641, 653 [1980].

**29.** See *Mallard v. U.S. Dist. Court for Southern Dist. of Iowa,* 490 U.S. ——, 109 S.Ct. 1814, 1823, 104 L.Ed.2d 318 [1989] (Stevens, J., dissenting).

**30.** See for example the California comprehensive public defender system adopted for each county in the state to be staffed with paid lawyers. Cal. [Gov't] Code §§ 27700–27712 (West. 1968 & Supp.1984). See also Cook, Appointment of Counsel in California: A *People v. Johnson* Perspective, 3 Whittier L.Rev. 499 [1981], where the author notes, at 500, that most counties in California maintain a public defender office. While the statutory scheme allows the court to assign private counsel in criminal cases, California jurisprudence indicates a firm policy against allowing an indigent defendant other court-assigned counsel where a public defender is available. See Cook, *supra* at 506–508.

**31.** This could be accomplished by creating a statewide service pool of lawyers for deployment in public service work. The Bar, as *an equalization mechanism,* could maintain an accounting system that would establish and keep track of how much public service may be due from each licensed lawyer who must serve. All lawyers would be in this service pool and be treated alike for conscription to *pro bono* work in conformity with the licensee's specialty and skills. In this manner lawyers who do not qualify for criminal law work could be utilized for *pro bono* civil assignments.

**32.** "One of the major conclusions of those who participated in the formulation of the Federal Criminal Justice Act and embodied in that act is that counsel must be provided in a *systematic fashion and not by ad hoc arrangements or day-to-day improvisation reflecting the ideas of individual judges.* See Att'y Gen. Report x-xi, 42–43; Criminal Justice Act of 1964, 18 U.S.C. § 3006A. This view is substantiated in the survey of state practice, which indicates that the worst inequities, to both the defendant and the bar, occur in those areas where no organized or systematic approach to the problem has been taken." (Emphasis added.) ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services, Approved Draft 1968, Commentary (a) at p. 15.

too rigid nor prescribed by this court's ukase. They should be formulated in committees and promulgated by rules.

### 1st Amendment speech and associational freedoms

I join the court today in condemning the use of a lawyer's advertising or competitive activity within a county as a permissible gauge for a nonresident legal practitioner's inclusion into a pool for criminal defense assignment in a county other than that in which he or she maintains a professional office. *No lawyer should be targeted for a criminal defense assignment as a punitive sanction for exercising* his/her 1st Amendment freedom to advertise *anywhere within the state.* To sanction discretion that would enable a judge to single out for assignment out-of-county lawyers who seek business dehors their professional residence would have an impermissibly chilling effect on the legal practitioner's 1st Amendment right to advertise.[33]

I would allow an assigned practitioner to exercise his/her 1st Amendment right to associate with other counsel in handling a criminal defense or other public service duty.[34] Any lawyer—whether volunteer, assigned or hired—should be free to associate with specialists or other counsel in providing defense services.[35]

### IV

PROPOSED SCHEME OF DICHOTOMIZED COMPENSATION FOR PRIVATE PRACTITIONERS WHOSE SERVICES ARE REQUISITIONED FOR THE DEFENSE OF INDIGENT CRIMINAL DEFENDANTS

I would not reward lawyers for discharging their public-duty service with that quantum of compensation which equals salaries drawn by the district attorneys/public defenders and their assistants. Rather, I would restrict legislative power to set rates for lawyers' public service work to no more than the Bar-prescribed quantum of *annual public-duty maximum.*[36] Once an individual practitioner has performed all that may constitute the permissibly claimed public service maximum, all work beyond that maximum—whether for the benefit of the State in criminal defense or for the benefit of some other governmental entity—should be paid at its *fair market value.*[37]

---

33. See *Bates v. State Bar of Arizona,* 433 U.S. 350, 383, 97 S.Ct. 2691, 2708–2709, 53 L.Ed.2d 810 [1977], reh'g denied 434 U.S. 881, 98 S.Ct. 242, 54 L.Ed.2d 164 [1977]; *Shapero v. Kentucky Bar Assoc.,* 486 U.S. 466, 476, 108 S.Ct. 1916, 1923, 100 L.Ed.2d 475, 486 [1988].

34. The right to associate with others in pursuit of political, social, economic, educational, religious and cultural ends is protected by the 1st Amendment. *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 [1965]; *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 3251, 82 L.Ed.2d 462 [1984]; see also *N.A.A.C.P. v. Claiborne Hardware Co.,* 458 U.S. 886, 907–909, 932–933, 102 S.Ct. 3409, 3422–3423, 3435–3436, 73 L.Ed.2d 1215 [1982]; *Abood v. Detroit Board of Education,* 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 [1977]. Governmental action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny (*Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 [1976]) and must clearly outweigh the repressive effect on association rights engendered by the governmental regulation.

35. I would save for another day the question whether both lawyers should be entitled to full compensation for services rendered.

36. The quantum of public service to be performed annually at the statutory rate by the bearer of a state license to practice law, which would constitute a burden to be borne *equally with others,* should be a norm initially developed by the Bar and then promulgated by the Supreme Court in the exercise of its legislative authority over professional activities of lawyers.

37. A minority of courts have recognized an analogous concept—although espousing somewhat different terminology. [1] In *People v. Randolph,* 35 Ill.2d 24, 219 N.E.2d 337, 341 [1966], the court dichotomized its compensation scheme into a "regular" and "extraordinary" service component, holding that the statutory fee limitation could not constitutionally be applied to extraordinarily lengthy and complex multiple representations; see also *People v. Atkinson,* 50 Ill.App.3d 860, 8 Ill.Dec. 932, 366 N.E.2d 94 [1977], *People v. Johnson,* 87 Ill.2d 98, 57 Ill.Dec. 599, 429 N.E.2d 497 [1981] and *In Re Petition for Fees,* 148 Ill.App.3d 453, 102 Ill.Dec. 67, 499 N.E.2d 624 [1986], where the court found "extraordinary circumstances" to exist and awarded compensation in excess of the regular statutory fee. [2] The court in *People v. Wilson,* 60 Misc.2d 144, 302 N.Y.S.2d 647 [1969], and *Application of Armani,* 83 Misc.2d 252, 371 N.Y.S.2d

I would hence adopt a dichotomized scheme of compensation for lawyers assigned to perform public service. For the required public service work a lawyer would be compensated at the statutory rate; but when that duty is done, excess

563 [1975], also found that extraordinary circumstances existed and awarded counsel fees in excess of the statutory maximum. [3] In *Jewell v. Maynard,* 383 S.E.2d 536, 547 [W.Va.1989], the court holds that a lawyer may not be required to devote more than 10 percent of his normal work year to court-assigned cases. The court established a compensation regime comparable to that in the federal court system and directed the legislature to establish a "mechanism that allows lawyers to receive up to $1,500 cash advances for out-of-pocket expenses". [4] Under the Nevada statutory scheme, fees may be awarded in excess of the statutory maximum allowed for indigent criminal defense work when "extraordinary circumstances" are present. See *Lueck v. State,* 99 Nev. 717, 669 P.2d 719 [1983]. See also Annot., Validity and construction of statute or court rule fixing maximum fees for attorney appointed to represent indigent, 3 ALR4th 577, 588, § 8 [1981].

**38.** The terms of Art. 2, § 24, Okl. Const. are: "Private property shall not be taken or damaged for public use without just compensation. . . ."
In *DeLisio v. Alaska Superior Court,* 740 P.2d 437, 442–443 [Alaska 1987], the court holds that "a court appointment compelling an attorney to represent an indigent criminal defendant is a taking of property for which just compensation is required," which is to be "measured by the fair market value of the property appropriated;" in *State ex rel. Stephan v. Smith,* 242 Kan. 336, 747 P.2d 816, 841–842 [1987], the court concludes that attorneys' services are property and thus subject to 5th Amend. protection; *State ex rel. Scott v. Roper,* 688 S.W.2d 757, 768 [Mo. 1985]; in *Jewell v. Maynard, supra* note 37, 383 S.E.2d at 547, the court acknowledges that a lawyer is duty-bound to accept court assignments but holds that *equal protection* and *due process* principles place an upward limit on this obligation; in *Family Div. Trial Lawyers v. Moultrie,* 725 F.2d 695, 705–706 [D.C.Cir.1984], the court noted that "an unreasonable amount of required uncompensated service" might constitute "taking" in the constitutional sense; see also *County of Fresno v. Superior Ct. of Fresno Cty.,* 82 Cal.App.3d 191, 146 Cal.Rptr. 880, 884–887 [Cal.App., 1978] (Hopper, J., dissenting); see generally Kendrick, Uncompensated Appointments of Attorneys For Indigent Criminal Defense: The Need For Supreme Court Standards, 14 S.W.Univ.L.Rev. 389 [1984]; Pirsig and Kirwin, *infra* note 39 at 164, n. 2.
A minority of courts take the position that assigned counsel are entitled to compensation in the absence of statute or court rule authorizing

services would qualify as property whose taking for public use must be compensated at *fair market value,* lest there be an expropriation in the constitutional sense.[38] Lawyers appointed from the private sector must also be compensated for all out-of-pocket expenses.[39] Volunteers who re-

it (Bradshaw v. Ball, *supra* note 7 at 298; *State v. Green,* 470 S.W.2d 571, 576 [Mo.1971]; see Annot., Right of Attorney Appointed by Court For Indigent Accused To, and Court's Power to Award, Compensation by Public, in Absence of Statute or Court Rule, 21 ALR3d 819, Part III [1968 & 1989 Supp.] ) and that a lawyer may not be appointed to render gratuitous service (*Knox County Council v. State ex rel. McCormick,* 217 Ind. 493, 29 N.E.2d 405, 413 [1940]; *Bedford v. Salt Lake County,* 22 Utah 2d 12, 447 P.2d 193, 195 [1968]; *McNabb v. Osmundson,* 315 N.W.2d 9, 16 [Iowa 1982]; *Honore v. Washington State Bd. of Prison Terms & P.,* 466 P.2d 485, 495–496 [Wash.1970]; *Carpenter v. County of Dane,* 9 Wis. 249, 252 [Wis.1859] ).
But cf. *United States v. Dillon,* 346 F.2d 633 [9th Cir.1965]; cert. denied 382 U.S. 978, 86 S.Ct. 550, 15 L.Ed.2d 469 [1966], where the court rejected the argument that compelled service amounts to a taking of property without just compensation; *Williamson v. Vardeman,* 674 F.2d 1211, 1214–1215 [8th Cir.1982]; *Weiner v. Fulton County,* 113 Ga.App. 343, 148 S.E.2d 143, 146 [1966], cert. denied, 385 U.S. 958, 87 S.Ct. 393, 17 L.Ed.2d 304 [1966] Annot., 21 ALR3d *supra* at 823–824; *but see State ex rel. Scott v. Roper, supra* 688 S.W.2d at 764, where the court notes that the majority of commentators appear to reject the reasoning in *Dillon, supra.* A number of the authors cited in *Roper* take the position that a lawyer's services should be treated as a property right.

**39.** Under this dichotomized compensation approach an Oklahoma County lawyer—after discharging his/her annual quantum of public service—when appointed to a case in Canadian County would draw pay at the fair market value on the basis of Canadian County standards, but out-of-pocket and travel expenses would be reimbursed on actual outlay basis.

There has been a trend toward allowing reimbursement of assigned counsel for out-of-pocket expenses. See *State v. Second Jud.Dist.Ct. In And For Co. Of Washoe,* 85 Nev. 241, 453 P.2d 421, 422–423 [1969]; *State v. Horton,* 34 N.J. 518, 170 A.2d 1, [N.J.1961]; *State v. Rush,* 46 N.J. 399, 217 A.2d 441, 448 [1966]; *People v. Randolph, supra* note 37; *People v. Watson,* 36 Ill.2d 228, 221 N.E.2d 645 [1966]; *Jewell v. Maynard, supra* note 37, 383 S.E.2d at 547; *Williamson v. Vardeman, supra* note 38 at 1215, where the court holds that the state cannot constitutionally require court-assigned counsel to make out-of-pocket expenditures in behalf of indigent criminal defendants; Annot., Construction of

quest public service assignments in excess of the Bar-established maximum would be compensated at the state-authorized rate.

### SUMMARY

I would accordingly direct that the fee-setting judge reconsider the claim on remand in conformity to my views by first determining if the affected lawyers had made, in this case, more than their required individual annual public-service contribution. If the judge should conclude that the case demanded work in excess of that minimum contribution, then the balance of the services rendered in the case should be compensated on the basis of its fair market value in addition to all out-of-pocket and travel expense reimbursement. That portion of the service which represents the public-work contribution should be compensated at the statutory rate.

Because the task of furnishing manpower for day-to-day criminal defense services is an executive function that may not be imposed upon the judiciary, I would urge the legislature to address itself to the problem at the earliest possible date with a view to establishing and implementing a professionally independent statewide public defender system *within* the executive branch of government. Until such agency is created, I would, as quickly as possible, begin utilizing the Bar as an equalization mechanism to create a statewide pool of qualified lawyers and to develop a plan to distribute evenly the Bar's public-service burden among *all* licensed practitioners within this State.

DOOLIN, Justice, dissenting.

The present traditional method of compensation and appointment of competent counsel to represent indigent defendants has worked well and existed in the British Colonial system when John Adams represented the British Troops who perpetrated the Boston Massacre, not to mention the

example of Abe Fortas when he sounded Gideon's trumpet in "Modern Times".

I dissent.

SIMMS, Justice, dissenting:

Under our system of criminal jurisprudence, a licensed attorney finds himself in a very unique position. That lawyer is an officer of the court. And as such, is bound to render service when required by his or her appointment to represent an indigent defendant. *Powell v. State of Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). However, he is not a "officer" within the ordinary meaning of that term. An attorney is not in the same category as marshals, bailiffs, court clerks or judges. A lawyer is engaged in a private profession, important though it be to our system of justice. As Justice Cordoza stated for New York Court of Appeals in *People, ex rel., Karlin v. Culkin,* 248 N.Y. 465, 470–471, 162 N.E. 487, 489 (1928):

"Membership in the Bar is a privilege burdened with conditions. The appellant was received into that ancient fellowship for something more than private gain. He became an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice. His cooperation with the court was due whenever justice would be imperiled if cooperation was withheld. He might be assigned as counsel for the needy, in causes criminal or civil, serving without pay."

In his treatise on Constitutional Limitations in 1868, Professor Cooley wrote:

"[T]he humanity of the law has provided that, if the prisoner is unable to employ counsel, the court may designate someone to defend him and shall be paid by the government; but when no such provision is made, it is a duty which counsel so designated owes to his profession, to the court engaged in the trial, and to the

State Statutes Providing For Compensation Of Attorney For Services Under Appointment By Court In Defending Indigent Accused, 18 ALR3d 1074, § 7 [1968]; Buchwald, Indigent Criminal Defendant's Constitutional Right to Compensated Counsel, 52 Cornell L.Q. 433 [1967]; Pirsig

and Kirwin, Professional Responsibility 164, n. 3 [3rd Ed.1976]. Court-assigned counsel, under the Criminal Justice Act, 18 U.S.C. § 3006A(d), are entitled to reimbursement for out-of-pocket expenses, see Annot., 9 ALR Fed 569, §§ 16–20 [1971 and 1989 Supp.].

cause of humanity and justice, not to withhold his assistance nor spare his best exertion in the defence of one who has the double misfortune to be stricken by poverty and accused of crime. No one is at liberty to decline such an appointment and few, it is to be hoped, would be disposed to do so." T. Cooley, Constitutional Limitation 334 (2nd Ed. 1871).

In a footnote, Cooley added: "[A] Court has the right to require the service whether compensation is to be made or not; and that counsel should decline to perform it, for no other reason than that the law does not provide pecuniary compensation, is unworthy to hold his responsible office in the administration of justice." *Id.*, 334, note 1.

Oklahoma's legislature embraced the philosophy of Cooley and Cordoza in enacting Title 5, O.S.1981, § 3 which reads, "It is the duty of an attorney and counselor: 7th. never to reject for any consideration personal to himself the cause of the defenseless or the oppressed." In other words, because of this unique relationship a lawyer enjoys with our system of criminal justice, fulfilling his legally recognized duty to render services when required by an appointment to represent an indigent defendant, cannot to me, be described in most instances in terms of a taking of his "property" without due process of law.

I can find no compelling reason why *Bias v. State*, Okl., 568 P.2d 1269 (1977) should not be applied in his case, thereby avoiding the award of extraordinary compensation on so-called constitutional grounds. Under *Bias*, Pyron and Mattingly are entitled to be reimbursed for extraordinary expenses. We pointedly held there, that:

"Prospectively, in order to obtain a compensation award above the statuatory amount a lawyer must prove thru clear and convincing evidence that (1) all extraordinary actions were taken in good faith, (2) all extraordinary work performed was necessary, (3) he is unable to maintain his practice, and (4) reasonableness of extraordinary fee."

I would simply remand this action to the trial court for consideration under the guidelines of *Bias* and, under proper findings by the trial court, the extraordinary expenses should be approved for payment by the Chief Justice from the State Judicial Fund.

I must also voice my opposition to the approach taken by my colleague, Vice Chief Justice Opala, in his special writing. He has recommended legislative action to establish a state-wide public defender system and in the interim, call upon the Oklahoma Bar Association to establish a pool of attorneys subject to appointment on a state-wide basis. Although a state-wide public defender system would be an acceptable solution, what is most disturbing is that my colleague would make that system a part of the Executive Branch of Government.[1]

In *Ferri v. Ackerman*, 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979), Mr. Justice Stevens observed:

"There is, however, a marked difference between the nature of counsels responsibilities and those of other offices of the court. As public servants, the prosecutor and the judge represent the interest of society as a whole. The conduct of their official duties may adversely affect a wide variety of individuals, each of whom may be a potential source of future controversy...."

"In contrast, the primary office performed by appointed counsel parallels

---

1. The Supreme Court has repeatedly indicated that it is the duty of the trial court, not the executive branch of government, to see that an indigent defendant's Sixth Amendment right to counsel is protected.

In *Powell v. Alabama,* the Court said:
"The duty of the trial court to appoint counsel under such circumstances is clear, as it is clear under circumstances such as are disclosed by the record here; and its power to do so, even in the absence of a statute, can not be questioned. Attorneys are officers of the court, and are bound to render service when required by such an appointment. See Cooley, Constitutional Limitations, supra, 700 and note.

The United States by statute and every state in the Union by express provision of law, or by the determination of its courts, make it the duty of the trial judge, where the accused is unable to employ counsel, to appoint counsel for him." 287 U.S., at 75, 53 S.Ct., at 65.

the office of privately retained cousel. Although it is true that appointed counsel serves pursuant to statuatory authorization and in furtherance of the federal interest in insuring effective representation of criminal defendants, his duty is not to the public at large, except in that general way. His principal responsibility is to serve the undivided interest of his client. Indeed, an indispensible element of the effective performance of his responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation."

My fear is that making a public defender a part of the executive branch of government places a lawyer in the position of serving two masters, i.e., the State of Oklahoma, and in a conflicting way, the interest of his client. I would not, under any circumstances, make a state-wide public defender system anything other than a totally independent body. If the legislature decides, after an impact study as to the funding of such a system, which undoubtedly would be considerable, that this state is ready for such a system, it should place such a defender system under the umbrella of the "The Oklahoma Public Defender System" created in 1988 by the enactment of 22 O.S.Supp.1988, § 1355, or more preferably, maintain the system as an arm of the Judicial Department of government.

In addressing the Pontotoc County Bar case, they do not object to being appointed to represent indigent defendants so much as to the fact they are not being adequately compensated. What may or may not be adequate compensation might vary from legal mind to legal mind. If the guidelines of *Bias* are met, however, by any attorney within the petitioning Bar Associations in making a claim for extraordinary expenses, I see no reason why the claim should not be approved.

The majority today ties the amount of fees to be awarded to counsel for indigent defendants to the hourly rate fixed for prosecutors. I think this is premature and unsupported. Not only are we without the empirical data of the impact of a state-wide public defenders system as suggested by my brother Opala, likewise we are without such data when it comes to establishing a state-wide hourly rate for lawyers, whose function is entirely different from that of the appointed counsel. *Ferri v. Ackerman,* supra.

We should direct the Legislature's attention to the Criminal Justice Act which the Congress of the United States enacted, 18 U.S.C. § 3006A titled "Adequate Representation of Defendants". This bill underwent careful scrutiny by both the House of Representatives and the Senate Judiciary Committee. See, *Ferri v. Ackerman,* supra, notes 15 and 16 at 100 S.Ct. page 407. Section 3006A closely parallels the Oklahoma scheme in certain respects. It provides for a $3500.00 cap to be paid to an attorney or defender organization in each case where one or more felonies are charged, with a provision for waiving the maximum amounts where it is shown the excess payment is necessary to provide fair compensation, and the payment is approved by the Chief Judge of the Circuit. *Bias,* supra, recognizes that excess payment may be necessary to provide compensation and this could only be done by order of the trial judge, with the approval of our Chief Justice. The federal act further provides for a uniform hourly rate for time expended in court or before a magistrate and a uniform hourly rate for time expended out of court. I would submit that enactment of a state statute closely paralleling 18 U.S.C. § 3006A, might be a simple and direct answer to the problems raised by the majority opinion in this case.

We should emphasize that the solutions to these problems are within the expertise and proper power of the Legislature and not this Court.